## Case No. 7,528.

### JORDAN v. WILLIAMS.

### SAME v. GATES.

[1 Curt. 69; 14 Law Rep. 421.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1851.

[1] [Reported by Hon. B. R. Curtis, Circuit Justice. 14 Law Rep. 421, contains only a partial report.]

R. H. Dana, for appellant.
J. H. Prince, for appellees.

CURTIS, Circuit Justice. The material facts, stated in the libels and testified to by the libellants themselves, are that, on the morning of the 11th of April, while the bark was lying in the harbor of Matanzas, the mate came forward at daylight and called all hands. No answer was made to this call. The call was repeated, in what one of the libellants characterizes as a loud, boisterous, and profane manner. Thereupon, Gates made answer, "You need not kick up such a noise, for you were answered the second time." Some insulting words then passed between the mate and Gates; Williams interposed in the quarrel, the mate struck Williams with his fist, the blow was instantly returned, Williams and the mate clenched each other; the master came forward and seized Williams by the hair of the head and drew him down to the deck, or, as Williams says, toward the deck, and, while he was in that position, the mate kicked Williams in the face. Williams cried out, that the mate was kicking him; and Gates approached and said, "Knock off such work as this!" The master let go his hold of Williams, and struck Gates twice in the face. The contest then ceased; the master ordered the men to go to their work, and both officers went aft. The answers of the master state, that he knew nothing of the affair, being below, until two of the crew came aft, and called to him that the men were trying to kill the mate; that he ran on deck, and found five of the men, who constituted, at the time, the whole crew, except two men and a boy, attacking the mate; that he rescued the mate from them, and in so doing received a blow from Gates, and part of his clothing was torn off his back. He denies that he seized Williams in the manner stated, or that, to his knowledge, the mate either struck or kicked him; and he sets forth in his answer that, by reason of the lapse of upwards of a year between the termination of the voyage and the filing of these libels, the mate, and the two men who were faithful to their duty, have gone beyond his reach, so that he cannot produce either of them as witnesses.

I do not deem it necessary, in this part of the case, to weigh very nicely the evidence of the libellants and the answers of the master, so far as they differ; because it does not seem to me that, if all which the libellants testify to were true, damages for an assault by the master ought to be awarded to either of these men. So far as appears, the first knowledge which the master had of this contest was when he saw his first officer and one of the crew grappling with each other on the forecastle, four others of the crew being close at hand, even if they were not taking part in the affray. These men constituted, at that time, the whole crew, except two men and a boy; and one of these two men is said to have been a deserter from a British ship of war, who kept himself concealed in the daytime in the hold. There was no second mate on board, the first mate having been discharged at Havana, as appears by the shipping articles, on the 10th of the preceding March; and though Rooker, the second mate, was, on the same day, promoted to be first mate, no second mate was shipped; and it was not until the 17th of April that Reed, one of the crew, was appointed second mate. So that, when the master first saw this affray between his only officer and one or more of the crew, he had reason to believe that one man and a boy were the only assistants on whom he could rely. That it was not only his right but his duty to interpose, and put an end to the contest immediately, there can be no doubt; and it is equally clear, that he was justified in using such means as a competent master, of ordinary coolness, judging upon the instant of the facts before him, might fairly deem necessary. It should be added that, from the nature of such an interposition, if force be necessary, the person thus lawfully using it, to quell a fight between an officer and one or more of the crew, cannot reasonably be expected to measure his exertions by so nice a standard as would be necessary if there were time for reflection, and opportunity to proportion the force exactly to meet the demand for it. Tested by these principles, I am not satisfied that the force used by the master was excessive. Interposing, as he did, to rescue the mate, it is, to my mind, highly improbable that he struck Gates, unless Gates was assisting Williams in attacking the mate; for it appears there had been no previous difficulty between them, and it was not an occasion when the master would have been likely voluntarily to begin a new quarrel. He used no weapon. He did not manifest any passion; and as soon as the mate was released he went aft, telling the men to go to their work. This does not seem to me to be a fit case in which to award damages against the master, for an assault, in favor of these libellants, who, according to their own showing, were both originally in the wrong. Not to answer when an order was given and heard, and this order is admitted to have been heard, was a breach of

discipline which might well excite the mate, and cause him to repeat the order with violence of manner, which they who had thus provoked it had scarcely a right to complain of, and still less a right to make an insulting reply,—an insult, perhaps the more readily given, and more deeply resented, because the mate had been very recently promoted to that office, from the post of second officer, in which, for many purposes, he was scarcely more than one of the crew. It is true, the assault by the mate, if he struck the first blow, was unjustifiable; but for this the master, who denies all knowledge of it, and who is not proved to have known it, cannot be held responsible; his duty being to put an end to the affray, whoever began it. For this cause of action, therefore, I can award no damages.

The second ground of complaint is, that the master caused the libellants to be imprisoned on shore, in the prison of the local authorities at Matanzas. This is attended with much more difficulty, and presents some questions of general importance, which, so far as I have been able to learn, are now for the first time raised. The material facts sworn to by the libellants, so far as they agree in their statements, are these: that, very soon after the termination of the affray above mentioned, and while the libellants and three others of the crew were engaged in removing the main hatch, the mate said to them, with an insulting address, "I will knock your brains out with a handspike." Williams then said to the master, "Captain Jordan, do you hear that?" And he replied, with an oath, "I do hear it." Williams then said to the master, "I will do no more duty on board this ship until I see the consul." Gates and the other three men said the same; and all five left their work and went forward into the forecastle. The mate came to the forecastle door, and said to Williams, "Williams, are you going to turn to?" The reply was, "No, not until I have seen the consul." The mate told him he was a fool, and he had better think no more about it. The master then came forward, and asked each man if he was going to turn to. Each said no, until he should see the consul. The master replied, with an oath, that they should go in the ship, and that they would wish themselves in hell before the voyage was up. He soon after went on shore, returned with two boats and armed men, who carried the men on shore and took them to prison. On the next day, or the next day but one, the consul came to the prison; they informed him of what had taken place, and he said he would see into it. In a few days he returned, the master being with him, and asked the men if they did not think they had better settle it, and go aboard of the ship again, and he repeated the question to each man. All but one replied, that they were afraid of their lives, after the threats that were made; and that one said he would go, if the consul would give him a paper showing what had

happened on board. This the consul refused. A few days afterwards, the master came again to the jail, asked if they were not tired of staying there; and said he had paid three months' board, and there might be enough for another month. He went away; and, on the 8th of May, the consul took them out of jail and sent them to the United States. This is the account given by the libellants themselves. In some material points it is directly met by the answer, and is not consistent with the certificate of the consul, which has been read as evidence by agreement, as a substitute for the consul's deposition, who, it is stated, has ceased to hold that office, and could not be found by the respondent. I shall hereafter advert to some of these discrepancies; but, before doing so, I must inquire whether the men were justified in their refusal to do any more duty on board until they could see the consul. This right is claimed under the 16th clause of the act of July 20th, 1840, which is in these words: "The crew of any vessel shall have the fullest liberty to lay their complaints before the consul or commercial agent in any foreign port, and shall in no respect be restrained or hindered therein by the master or any officer, unless some sufficient and valid objection exist against their landing; in which case, if any mariner desire to see the consul or commercial agent, it shall be the duty of the master to acquaint him with it forthwith, stating the reason why the mariner is not permitted to land, and that he is desired to come on board; whereupon, it shall be the duty of such consul or commercial agent to repair on board and inquire into the causes of the complaint, and to proceed thereon as the act directs." This does not, in terms, give to the crew the right to refuse to do duty until they can see the consul. It may fairly be implied, that they are not bound to do such duty as would prevent the exercise of the right to see him. They cannot be lawfully required to get under weigh to go to sea, and thus be deprived of the right to lay before him their complaint of the unseaworthy condition of the vessel; they cannot properly be kept at work, and thus prevented from landing to lay their complaint before him, unless some sufficient and valid objection exists against their landing. But it by no means follows that they have the right, at any moment, to refuse to do any duty whatever till they have seen him. The master is to allow them the fullest liberty to lay their complaints before the consul; but the exercise of the fullest liberty to do so, when interpreted reasonably, is consistent with the master's being allowed fairly to exercise some discretion as to the time and mode of landing, and as to the prosecution of the work of the ship. Certainly, the refusal of the crew to obey the orders of the master is not the first step to be taken, on the instant, when this right to see the consul is claimed. Such a refusal may be justifiable, when absolutely necessary to prevent the loss of the right;

but I think very bad consequences would follow from admitting that any thing else would justify it. As long as the obligations of the master, to allow the crew to lay their complaints before the consul, and of the crew to obey his orders and do their duty on board, can be reconciled, they must be; and I see nothing in this case which made the latter inconsistent with the former. But, in my judgment, the claim of the crew to see the consul, and their refusal to do duty until they should see him, cannot be supported by this act, because their complaint was not one which the act was designed to enable them to lay before him.

It can hardly be supposed that congress intended to secure to the crew the fullest liberty to apply to the consul concerning any matter or thing, of which they or any of them might desire to complain. Some practical result of such complaint, by means of some jurisdiction of the consul over its subject-matter, must be considered to have been the purpose of this provision of the act.

To secure to the crew the right to land, or to impose on the consul the duty of immediately repairing on board, merely that he might hear and do nothing, because he had no power to do any thing, cannot have been intended. Nor is any such intent indicated by the language of this law. It says, "to lay their complaints before the consul," &c. What complaints? This question is answered by the act, which provides, in clause nine, for a complaint by a mariner to a consul, that he is detained contrary to his agreement, or after he has fulfilled it, and which directs how the consul is to inquire into the truth of the complaint, and what he may do if he finds it well founded; and by clauses twelve to fifteen, inclusive, which authorize a complaint to the consul concerning the seaworthiness of the vessel, and point out what proceedings shall be had, and what jurisdiction shall be exercised by the consul upon such complaint. When, therefore, the next clause says the crew shall have the fullest liberty to lay their complaints before the consul, the natural meaning is, the complaints which, by this act, they are authorized to make, and he required to hear; and this meaning is made quite plain by the concluding words of this clause, which require the consul (in case the crew cannot land) to repair on board, and "inquire into the causes of the complaint, and proceed thereon as this act directs." If he is to do this when he goes to them, I presume he is to do the same when they come to him; and, if so, it necessarily follows, that the complaints which they have, by this act, a right to lay before him, are complaints upon which the consul can "proceed" as this act directs. Not that they must be well founded, in part or in whole, but that their subject-matter must be such that, if well founded, the consul, by this act, has authority to proceed thereon.

Now, I do not find in this act, or elsewhere, that power is conferred on a consul of the United States to take cognizance of a complaint by a part of the crew, that the mate had threatened to beat out their brains with a handspike, followed by an appeal by the mate to the principal party in the quarrel, desiring him to think no more about it; or, to state it more abstractly, I do not find that a consul has power, upon the application of the crew, to inquire into quarrels of this nature. The only approach towards such a case is in the seventeenth clause of the act, which is in the following words: "In all cases where deserters are apprehended, the consul or commercial agent shall inquire into the facts; and, if satisfied that the desertion was caused by unusual or cruel treatment, the mariner shall be discharged," &c. It is to be borne in mind that this is a new power, conferred on the consul for the first time; that it is a power to dissolve a contract, or rather, authoritatively and finally to declare that it has been so far broken by one party that the other party is no longer under obligation to perform it; that this is a very high power, and, consequently, is not to be extended to a case not fairly within the words of the act, which apply only to a particular class of cases, where deserters are apprehended, and the desertion was caused by unusual or cruel treatment; and fall far short of cases like this, where, at the worst, only threats have been uttered.

I am clear, therefore, that the refusal of the men to do duty can find no justification in this act; that this reference, especially after the mate had asked the principal party to the quarrel to think no more about it, is strong evidence of an insubordinate temper, and justified the master in applying to the consul. That he did so apply, I am satisfied; his answer so states; and though an answer has no technical effect as evidence, it is not wholly without weight in considering his conduct. There is nothing in the case tending to contradict this allegation in the answer, and the certificate of the consul, which is made evidence in the case, proves such application to him. Being satisfied, then, that the master did apply to the consul, and that he had, in point of fact, a case to lay before him, in which five out of seven of his crew, after a fight between one or more of them and the mate, had unjustifiably refused to do duty on board, I do not think it reasonable to doubt that he did lay this case before him, as he swears in his answer, especially when the consul certifies that on that day he acted officially, on the very ground that these men had refused to do duty on board. Nor can I come to any other conclusion than that the interposition of the local authorities was by the procurement of the consul. It is true the men both testified that the consul did not see them on that day; but so far as this tends to show that the consul did not interpose at all on that day, it is directly met by the answer, which says that the consul himself

sent the officer, who removed the men from the vessel, and the consul's certificate declares, in so many words, that he ordered the men to be imprisoned for safe keeping. in the Royal Prison. I must consider the imprisonment of these men, therefore, as an act of the local authorities, done upon the request of the consul, by reason of information given him by the master, that the men had unlawfully refused to do duty on board. And the question is, whether the master is responsible for their imprisonment, as for a tort. Prior to the act of congress of the 20th July, 1840, it had repeatedly been decided (U. S. v. Ruggles [Case No. 16,205]; Jay v. Almy [Id. 7,236]; Wilson v. The Mary [Id. 17,823]; Magee v. The Moss [Id. 8,944]; The Nimrod [Id. 10,267]; The Dawn [Id. 3,665]), that a master could not lawfully imprison a seaman on shore, unless he were unable to restrain him on board; that a case of urgent necessity must be made out; and that, although it would be a mark of good faith, on the part of the master, to take the advice of a consul, as being a person confided in by the government, for many purposes, yet such advice would not be otherwise operative to protect the master because consuls had no power or duty in reference to the matter. I am satisfied of the correctness of these decisions, but I think the act of 1840 has materially changed the relation of consuls to this subject. The eleventh clause of the act is as follows: "It shall be the duty of consuls and commercial agents to reclaim deserters, and discountenance insubordination by every means within their power; and where the local authorities can be usefully employed for that purpose, to lend their aid, and use their exertions to that end, in the most effectual manner."

This certainly confers on consuls authority, and in strong terms makes it their duty, to employ the local authorities, to discountenance insubordination, where they can be usefully employed for that purpose; and, by a necessary implication, the consul must judge and determine, whether any particular case is one in which they may usefully be employed. Certainly his decision is not final. If he is guilty of any malversation, or abuse of power, the eighteenth clause of this act makes him liable to any injured person for all damage occasioned thereby, as well as to be punished criminally. But I think it was the intention of the act to intrust him with power officially to invoke the aid of the local authorities, subject always to a just responsibility for any abuse of this power. If the local authorities are to be used, it is a reasonable, not to say necessary, inference, that they are to act in such manner, and by such means as they ordinarily employ; and the most common and obvious means are the use of a place of confinement, under the control of the local government. The power, in the most effectual manner to lend their aid, and use their exertions to employ the local authorities to discountenance insubordination, can hardly be said to be exhausted, while the means most usually employed by those authorities have not been used. I think, therefore, that this act conferred upon consuls the power, and made it their duty, where the local authorities can, in their judgment, fairly exercised, be usefully employed to restrain a part, or the whole, of a crew, who are in a state of insubordination, to use their exertions to that end, in the most effectual manner, and that this restraint may be exercised by confinement on shore, in such place as is ordinarily used by the local authorities for similar purposes. And further, that the consul, in so doing, acts as a public officer, upon his official responsibility, intrusted with the power to judge in the first instance, of the propriety and fitness of so doing, and subject to his responsibility to any injured by an abuse of his power.

The reasons which have led courts to determine that it was not one of the ordinary powers of a master to imprison his men on shore, do not exist, or apply with greatly diminished force to the action of a consul in that behalf, on the information of the master. A public officer is thus interposed between the master and the seaman, who is to act under his official responsibility to the government, whose servant he is, as well as to the party who is affected by his act; he is a resident at the place, and cannot sail away, and leave the man to suffer or die in a foreign prison. He is intrusted by law with the care of destitute seamen, and with their return to their own country. It is to be presumed that he will have a due regard to the safety and rights of all, and, while he discountenances insubordination, by every means in his power that he will not employ the local authorities in a way to oppress the seamen of the United States. But whatever may have been the reasons which operated to produce this law, I think it has conferred on consuls the power above described. If this be so, it it quite clear that the responsibility of the master is modified. If the consul may judge when the local authorities may usefully be employed, it would be a great hardship to hold the master responsible for a mere error of judgment of a public officer, in whose appointment he had no voice, and who is in no just sense his agent. At the same time, if the consul acts on the application of the master, the master is not free from responsibility. In the first place, he is bound to represent the case truly to the consul, and, in the next place, the case must be such that he, as a reasonable man, can honestly believe it to be within the power of the consul. If he knows, or ought to know, that it is not a case in which the local authorities should be appealed to, or in the words of the act, in which they can be usefully employed, then he necessarily knows that the case is not within the limited power of the consul, and that, consequently, he cannot shelter himself under

his authority. But if the master represents the facts truly,—if the facts are such that a competent master might well believe that the local authorities might be usefully employed, and the consul so considers, and applies to them, and they, at the consul's request, take the men on shore, and there confine them, in the place and manner usual at such port, I think the master is not guilty of any tort, although, upon a review of all the facts, the court might be of opinion, that it was not strictly necessary to remove the men from the ship.

Applying these views to this case, I find no evidence that the master misrepresented the facts to the consul, and I am not able to come to the conclusion that the case was of such a nature that the master ought to have known that the local authorities could not usefully be employed in the way they were employed. Five out of seven of his crew had unlawfully refused to do duty; they had been appealed to by the mate, who alone had given them any cause of complaint, in a manner calculated to allay any apprehensions which they might have entertained, but they still refused. Each had been required, by the master, to return to his duty, and each had distinctly refused. The deserter who was on board could hardly be relied on for any very effectual assistance, and one officer, and one man, and a boy, were all that were left; under these circumstances, some masters might, and probably would, have reduced these men to obedience, on board the ship; but I cannot say that it was a case where the master ought to have known that that was the only proper course, and therefore I am of opinion that the master is not responsible for a tort by reason of their imprisonment. Nor do I think he incurred that responsibility by their remaining in prison. It is quite clear that he was anxious to have them return to their duty, and gave them early and repeated opportunities to do so. They steadily refused, alleging that they were afraid for their lives, if they should return on board. If five able-bodied men really had such fear of the master and mate, who alone had shown any disposition to injure them, simply because of some threats uttered in the heat of blood, it seems to me to have been an unreasonable fear. It is observable that neither of the libellants asserts, in his libel, or his testimony, that he did really entertain such fear. Their justification for their refusal to return to the ship resting solely on this fear, I think they should have pleaded it as a fact, and sworn to it as a fact, and not allowed it to rest solely on their statements at the time, which do not seem to have had a reasonable foundation in the occurrences as they detail them.

After they had been in prison some days, the answer says eight days, and after repeated refusals to go on board, or do any duty if forced on board, the consul dischar-

ged them from the vessel, the master shipped other men in their place, paid to the consul fifty dollars for their passage money to the United States, and one hundred dollars more for expenses arising out of their arrest, and board in prison, and from that time the answer avers that the master had no control over, or connection with them, and that whatever was done, was by the consul alone. The act of 1840 empowers consuls, upon the application of the master and any mariner, to discharge such mariner, if he thinks it expedient, without requiring the payment of three months' wages. I do not understand, from any of the proofs, that these men applied in terms for their discharge; but I think their unjustifiable refusal to go on board, or do any duty if forced on board, would enable the consul to act upon the request of the master, and discharge them, and the men themselves evidently considered that they had in effect requested their discharge, for they have made no claim to be paid any wages. After they were thus discharged, I consider the consul, and not the master, responsible for their further detention. They no longer formed part of his crew; he no longer sustained any relation to them. The answer declares he did nothing to cause their further detention, and there is not sufficient proof to the contrary.

I am of opinion, therefore, that the responsibility for their further detention must rest with the consul by whose orders they were originally put in prison, and at whose sole instance they were kept there, after they were discharged from the bark. The answer states, that the consul said something to the master about sending them home to be tried; and if he considered it his duty to detain them, by aid of the local authorities, that he might send them to the United States for that purpose, his conduct might be justified. On any other ground it was grossly improper; for he had no right to punish them by imprisonment; and surely, destitute seamen are not to be provided for by a consul by keeping them in a foreign jail.

There is one other cause of action set forth in these libels, which requires to be distinctly considered. It is, that the men were sent to the jail without any clothing or bedding, which was detained on board the bark, and finally sold by the master. It is in proof, that the libellants slept on the flag-stones, using their boots for pillows; and that, during all the time they were in prison, they had no clothes except the working-dress in which each was when taken on shore. This detention of their clothing is not justified; and no excuse is attempted, except that the answer alleges that the consul told the master their clothing was forfeited. But it does not appear when this information was given, and it is difficult to see how it could have been supposed to be correct. Before the men had

finally refused to return on board, and while it was yet uncertain whether they would return, there could be no pretence for treating them as deserters; and when it became certain that they would not voluntarily return, they were regularly discharged, and desertion became impossible. I consider it to have been a breach of duty by the master, and a wrong to these men of a somewhat aggravated character, to detain all their clothing from them during eight days, and then sail away and finally deprive them of it. I shall therefore allow to each the pecuniary value of his clothing, together with the sum of eight dollars, for special damages, arising from its detention while in prison. From analogy to the rule followed by Judge Hopkinson, in the case of Brower v. The Maiden [Case No. 1,970], I should deduct a proportional part of the prison fees and expenses and the cost of shipping the new men, if I did not consider that the wages remaining unpaid to each of these men at the time of their discharge was just about a fair compensation for their proportions of these charges; and it seems to me that, under the circumstances, it is just that the ship should neither lose nor gain by their discharge. It is not easy to affix a value to the clothing of each libellant. It is sworn to be worth from eighty to one hundred dollars for each; and the answer puts it at very much less sums. Upon the best judgment which I can form, I think the sum of forty-eight dollars will be a just allowance for the clothing and the special damage of each. This sum is therefore awarded to each libellant. I do not allow any costs of the appeal to either party. The decree of the court below will be modified accordingly.

I desire to add, that it is stated at the bar, that the evidence upon which the appeal has been heard is not identically the same as in the district court; and that several of the questions which have now been decided were not there raised.